STEPHEN T. KAM (Cal. Bar No. 327576)
Email: kams@sec.gov
DAVID ROSEN (Cal. Bar No. 150880)
Email: rosend@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Katharine E. Zoladz, Regional Director
Brent Wilner, Associate Regional Director
Douglas M. Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER BOOTH KENNEDY,<br><br>Defendants, | Case No. 2:24-cv-10608<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendant has, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Kennedy resided in this district during the relevant period and is currently a resident of this district.

## SUMMARY

4. Between July 2020 and July 2021 (the "Relevant Period"), Defendant Christopher Booth Kennedy, a former registered representative at registered broker-dealer Western International Securities, Inc. ("Western"), orchestrated a scheme to defraud nineteen retail brokerage customers by recommending a short-term, high-volume investment strategy without a reasonable basis to believe the transactions were in those customers' best interests.

5. To carry out his scheme, Kennedy made false and misleading statements regarding the value of his customers' accounts and the success of his trading strategy for the purpose of concealing the substantial losses that resulted in his customers' brokerage accounts. Kennedy sent one customer at least five falsified monthly account statements which misrepresented that the customer's portfolio had increased in value when, in fact, Kennedy's trading had resulted in substantial losses to that account. For example, one falsified account statement indicated that the customer had assets worth approximately $5 million, when in fact the customer's assets were only worth approximately $100,000.

6. Kennedy's actions violated Regulation Best Interest ("Reg BI"), which requires a broker, dealer or associated person to act in the best interest of their retail customers when recommending securities transactions. Specifically, Kennedy's

1  recommendations of a short-term, high-volume investment strategy was not in his
2  customers' best interests due to the large commissions that Western, and ultimately
3  Kennedy, received for these high-volume trades, placing Kennedy's interest ahead
4  of the retail customers' interests.

5      7.    In total, Kennedy's trading scheme exceeded $363 million in total
6  transactions in the customer accounts, resulting in over $9 million in customers
7  losses. The nineteen brokerage customer accounts paid approximately $1.277
8  million in total commissions to Western, $958,134 of which was paid to Kennedy.

9      8.    Through his conduct, and as further detailed in this complaint, Kennedy
10  violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act
11  and Rules 10b-5 and 15*l*-1, known as the General Obligation of Reg BI, thereunder.

12      9.    As a result of this conduct, the SEC seeks a permanent injunction against
13  Kennedy for his violations of the federal securities laws. The SEC further seeks to
14  disgorge his ill-gotten gains, along with prejudgment interest thereon, and to impose
15  civil money penalties against Defendant pursuant to Sections 21(d)(3) of the
16  Exchange Act and 20(d) of the Securities Act.

17  <center>**THE DEFENDANT**</center>

18      10.  **Christopher Booth Kennedy** ("Kennedy"), age 46, is a resident of Simi
19  Valley, California. He worked as a registered representative at various brokerage
20  firms from 2001 through 2021. He was a registered representative for Western
21  from August 2017 until July 2019 and from November 2019 until August 2021.
22  Western terminated Kennedy on August 27, 2021. Kennedy held Series 7, 63, and
23  66 licenses and is currently unemployed. In November 2023, Kennedy settled a
24  FINRA matter related to the conduct alleged in this Complaint, under the terms of
25  which he was barred from associating with any FINRA member. *FINRA Dept. Of*
26  *Enforcement v. Christopher Booth Kennedy*, FINRA Discipl. Proc. No.
27  2021072389001 (Nov. 17, 2023).

28

## RELATED ENTITY

11. **Western International Securities, Inc.** ("Western") is a Colorado corporation headquartered in Pasadena, California and has been registered with the Commission as an investment adviser since March 2008 and a broker-dealer since November 1995. In April 2017, Western acquired the brokerage operations of Financial West Group, where Kennedy was employed. In April 2020, Atria Wealth Solutions, Inc., a wealth management solution holding company that serves five broker-dealers, acquired Western. In February 2024, Atria Wealth Solutions announced that it agreed to be acquired by LPL Financial. On July 30, 2024, the Commission instituted a settled cease-and-desist and administrative proceeding against Western related to the conduct described in this memorandum. *In re Western International Securities, Inc.*, Admin. Pro. File No. 3-21986, (July 30, 2024).

## THE ALLEGATIONS

I. **Kennedy's Customers**

12. From July 2020 to August 2021, Kennedy worked as a registered representative at Western, a registered broker-dealer.

13. During this period, he had approximately 150 brokerage customers with approximately $60-$70 million in investible assets.

14. Among his customers were nineteen accounts (the "Defrauded Customers"), which included Customer A, Customer B, Customer C, Customer D, and Customer E. The Defrauded Customer accounts represented approximately $22 million in assets.

15. The Defrauded Customers were retail customers because each of the nineteen accounts holders was a natural person who received recommendations for the securities transaction and/or investment strategy from Kennedy.

## II. Kennedy Engaged in a Scheme to Make a Series of Trades with No Reasonable Basis to Believe the Transactions Were in Those Customers' Best Interest

### A. Kennedy's Trading Strategy in the Defrauded Customers' Accounts

16. For the accounts of the Defrauded Customers, Kennedy utilized a speculative, short-term trading strategy during the Relevant Period. This strategy included day-trading (*e.g.*, buying and selling a particular security on the same day) in the common stocks of public companies.

17. For the first few months of 2020, Kennedy executed this strategy by trading primarily in stocks in the Defrauded Customers' accounts. However, by approximately June 2020, Kennedy began primarily trading in option contracts in the Defrauded Customers' accounts, with a short period before expiration.

18. An options contract provides the buyer the right – but not the obligation – to buy or sell the underlying asset at a specific price on or before a certain date. Trading in option contracts is significantly riskier than trading in the underlying stocks because options expire after a certain date and become worthless.

19. Because Kennedy purchased option contracts with a short period before expiration, the risk that the option contract could expire was increased. In fact, some of the option contracts that Kennedy purchased on behalf of his customer expired worthless.

20. Kennedy had little to no experience engaging in this trading strategy. Apart from attending a one-week educational seminar in 2019, Kennedy had never day-traded for a proprietary account at a broker-dealer or a hedge fund.

21. By August 2021, Kennedy had over $9 million in losses in the Defrauded Customers' accounts by engaging in this high-risk day trading strategy.

### B. Kennedy's Losing Trading Strategy Generated Large Commissions for Himself

22. Kennedy engaged in this short-term speculative trading strategy, in part, because executing a high volume of transactions would generate large amounts of commissions for himself.

23. Each transaction Kennedy executed in his customers' accounts generated a commission. By engaging in a large number of transactions, whether profitable for his customers or not, Kennedy was able to generate large amounts of commissions.

24. For example, despite the fact that the average monthly equity across each of the Defrauded Customers' accounts was $721,059, Kennedy made an average of approximately $2,412,681 in monthly transactions in these accounts, totaling $363,767,876 over the entire period.

25. Through his scheme, Kennedy generated $1,277,512 in commissions for Western, of which Kennedy received $958,134, from the Defrauded Customers' accounts.

26. Kennedy's short-term, high-volume trading in the Defrauded Customers' accounts was highlighted by the fact that out of approximately 450 firmwide Western registered representatives in 2021, Kennedy was the top ranked representative in commissions generated at Western, despite the fact that he only worked eight months in 2021 before being terminated on August 27, 2021.

27. The high commissions the Defrauded Customers paid to the firm led Kennedy's direct supervisor to suggest that Kennedy switch his customers to fee-based accounts instead of the existing commission-based accounts, which would have resulted in the Defrauded Customers paying far less in commissions and other fees.

28. Kennedy refused to do so, further evidencing that the primary purpose of his scheme was to generate as much in commissions as possible for himself.

### C. Kennedy Concealed the Defrauded Customers' Investment Objectives and Risk Tolerances

29. When opening accounts with Kennedy at Western, the Defrauded Customers were required to provide information for their account profiles. This information included the customers' investment objectives and trading risk tolerance.

30. Six of the nineteen Defrauded Customers' account profiles reflected a lower investment objective and risk tolerance than was required by Western to permit Kennedy to trade in options in their accounts.

31. Due to the increased risk for losses in trading in options in their accounts, Western's compliance team instructed Kennedy to have these six customers update their account profiles to reflect more aggressive investment objectives and higher risk tolerance.

32. Rather than following the Western compliance team's instructions, Kennedy updated the customers' account profile information himself by completing the requisite forms on his customers' behalf using false information. In other instances, Kennedy provided his customers with misleading information, instructed them to complete and sign the requisite forms, then submitted the forms to Western's compliance department. By engaging in this conduct, Kennedy was able to continue his fraudulent trading strategy in the Defrauded Customers' accounts.

### III. Kennedy Made False and Misleading Statements to the Defrauded Customers Regarding the Losses in Their Accounts

33. To avoid his customers discovering his fraud, Kennedy made false and misleading statements to his customers about the value of their brokerage accounts.

34. Specifically, Kennedy emailed fabricated account statements to one customer and falsely represented to others that their account values were much higher than the amounts that were actually reflected on their account statements.

### A. Fabricated Account Statements

35. In 2018, Customers A and B opened a joint brokerage account at Western with Kennedy as their account representative.

36. In 2021, Customers and A and B were attempting to refinance their home and needed to provide their monthly brokerage account statements to a bank lender. Customers A and B asked Kennedy to provide them with access to the Western online customer portal so they could access their monthly account statements.

37. Kennedy falsely told Customers A and B that technical issues with the account portal prevented them from gaining access to their accounts. Kennedy then sent Customers A and B copies of what he claimed to be their Western monthly account statements through his personal email address rather than through his Western business email account, in violation of Western's internal policies and procedures.

38. The account statements that Kennedy sent to Customers A and B were altered to greatly overstate the value of their account holdings as reflected in the chart below:

| Account Statement Date | Fabricated Account Value | Actual Account Value |
|---|---|---|
| February 2021 | $2,446,318 | $955,587 |
| March 2021 | $2,784,792 | $673,384 |
| April 2021 | $2,960,750 | $647,507 |
| May 2021 | $3,381,087 | $1,060,720 |
| June 2021 | $5,658.339 | $603,316 |
| July 2021 | $5,264,365 | $101,708 |

39. As set forth above, the fabricated account statements falsely represented that Customers A's and B's accounts had dramatically increased in value, from $2.4 million to $5.3 million, between February and July 2021. In reality, Customers A's and B's account value had decreased substantially during this period from $955,587 to only $102,000, due to Kennedy's failed trading strategy.

40. Kennedy emailed these fabricated account statements to Customers A and B to perpetuate his scheme and to conceal the fact that, contrary to what he had represented to them, Customers A and B had lost over 90% of their account value due to Kennedy's fraudulent scheme.

### B. False Statements Regarding Account Values to Other Customers

41. In 2021, Kennedy falsely told several customers in a series of text messages and telephone conversations that the securities in their accounts were worth far more than their actual value.

42. For example, in a March 25, 2021 text message, Kennedy represented to Customers A and B that their account value was approximately "*[$]3.2 [million]*" even though the actual value of their account at the time was approximately $1.2 million. Again, on May 13, 2021, Kennedy falsely stated to Customers A and B that the "*[a]ccount value is $3,522,000*" when the actual value of the account at the time was only approximately $650,000.

43. On or about July 16, 2021, Kennedy falsely told Customer C that her Western account statements, which showed millions of dollars in losses at the time, were incorrect due to various Western technical "*errors*." In reality, the account statements that Customer C saw were accurate, and the losses reflected in those statements had been caused by Kennedy's failed trading strategy.

44. On or about July 30, 2021, Customer D asked Kennedy why his account showed a negative balance of $14,957. In response, Kennedy sent an email falsely stating that "*[i]t is not [a negative balance]. ALL TRADES being removed.*"

However, Customer D's account did indeed have a negative balance. Moreover, contrary to Kennedy's claim, the trades Kennedy had executed in Customer D's account were accurately reported in the account statements and had not been in any way removed.

45. In or around August 17, 2021, Customer E expressed concerns to Kennedy about the large decrease in the value of their nine Western brokerage accounts. Customer E's online balance indicated a total value of approximately $457,000, yet Kennedy falsely told Customer E that the value of their nine Western accounts was over $860,000.

46. Kennedy's false and misleading statements to Customers A, B, C, D and E were material. A reasonable customer would have considered it important to their investment decisions to know that their account values were substantially less than represented.

### IV. Kennedy's Fraud Is Discovered

47. In or around August 2021, Customer A contacted Kennedy's supervisor inquiring about the veracity of the account statements Kennedy had been sending him.

48. Western terminated Kennedy in August 2021 for his failure to cooperate with Western's internal investigation.

### V. Kennedy's Reg BI Violations

#### A. Reg BI Requirements and Commission Guidance

49. Reg BI, which was implemented on June 30, 2020, established a standard of conduct for broker-dealers and associated persons when they recommend securities transactions to retail customers.

50. The SEC issued a 175-page adopting release, offering guidance on how the Commission interprets Reg BI. *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 34-86031, 84 Fed. Reg. 33318 (July 12, 2019) (the "Adopting Release").

51. Reg BI's General Obligation requires a broker, dealer, or a natural person associated with a broker or dealer, when making a recommendation of any securities transaction to a retail customer, to act in the best interest of that retail customer at the time the recommendation is made, without placing the financial or other interest of the broker, dealer, or associated person ahead of the interest of the retail customer.

52. Reg BI's General Obligation is satisfied only by compliance with four Component Obligations: (1) Disclosure Obligation, (2) Care Obligation, (3) Conflict of Interest Obligation, and (4) Compliance Obligation.

53. The Care Obligation requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with making a recommendation of a securities transaction to a retail customer. Failure to comply with the Care Obligation constitutes a failure to comply with Reg BI's General Obligation.

54. The Adopting Release states that what constitutes reasonable diligence depends on, among other things, the complexity of, and risks associated with, the recommended security.

55. The Care Obligation also requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to have a reasonable basis to believe that "*a series of recommended transactions . . . is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, or such natural person making the series of recommendations ahead of the interest of the retail customer.*"

56. The Adopting Release states that what is in the best interest of a retail customer depends on the facts and circumstances of the recommendation, including "*matching*" the recommended security to the retail customer's investment profile. Where the "match" between the retail customer profile and the recommendation

appears less reasonable, it is more important for the broker to establish that it had a reasonable belief that the recommendation was in the best interest of the retail customer.

57. The Adopting Release also states that, in addition to "*matching*" the recommendation to the customer's suitability profile, a registered representative should also exercise reasonable diligence, care, and skill to consider reasonably available alternatives.

**B.    Kennedy Recommended a Series of Transactions to the Defrauded Customers Without a Reasonable Basis to Believe the Transactions Were in Those Customers' Best Interest**

58. Kennedy's short-term, high-volume investment strategy, and the large aggregate associated commissions, were not in the Defrauded Customers' best interest in light of their investment profiles.

59. By recommending that the Defrauded Customers' accounts engage in a series of transactions in the form of speculative day-trading in options, and by actually executing those trades in the accounts, Kennedy generated large amounts of commissions for himself and Western.

60. At the time that he made these recommendations, Kennedy failed to adequately and reasonably consider the financial risks posed to his customers, whether those risks were consistent with their risk profile, and the impact of the costs of the trading strategy to his customers.

61. Kennedy had virtually no experience in day trading for a proprietary account at a brokerage firm or a hedge fund and therefore did not exercise reasonable care, diligence, and skill with respect to his trading strategy. Kennedy's lack of reasonable care, diligence, and skill is further demonstrated by the over $9 million in losses his strategy generated in the Defrauded Customers' accounts by August 2021.

## VI. Kennedy Acted with Scienter and Negligently

62. During the Relevant Period, Kennedy acted with scienter as demonstrated, in part, by the following conduct:

(a) Kennedy engaged in a short-term, high-volume investment strategy without a reasonable basis for the purpose of generating large commissions for himself, resulting in his customers losing a total of approximately $9 million during the Relevant Period.

(b) Although Kennedy knew that his trading strategy was unsuccessful based on his execution of the trades and his access to the customer account records showing millions of dollars in losses, he knowingly lied to his customers and falsely told them that they had made millions of dollars as a result of his trading strategy and told at least four customers that their account values were substantially higher than their actual values.

(c) Kennedy sent fabricated account statements to Customers A and B.

(d) Kennedy refused to cooperate with Western's internal investigation.

63. The conduct outlined above also demonstrates that Kennedy failed to act reasonably under the circumstances, and thus acted negligently.

## VII. Kennedy's Fraudulent Scheme and False and Misleading Statements Were in Connection with the Purchase, Offer, or Sale of Securities

64. Kennedy's deceptive acts in furtherance of the scheme and his materially false and misleading statements were all in connection with the purchase, offer, or sale of securities.

65. Kennedy engaged in the deceptive acts and made the materially false and misleading statements concerning the value of his customers' accounts in order to perpetuate his scheme of purchasing and selling common stocks and option contracts on behalf of the Defrauded Customers.

66. Kennedy obtained money as a result of his misconduct through the commissions he was paid as a result of trading in his customers' accounts.

### FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

67. The SEC realleges and incorporates by reference paragraphs 1 through 70 above.

68. By engaging in the conduct described above, Defendant, directly or indirectly, with scienter, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

69. Defendants has, with scienter, employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on investors by the conduct described in detail above.

70. By engaging in the conduct described above, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), and 240.10b-5(c).

# SECOND CLAIM FOR RELIEF

## Fraud in the Offer or Sale of Securities

## Violations of Section 17(a) of the Securities Act

71. The SEC realleges and incorporates by reference paragraphs 1 through 70 above.

72. By engaging in the conduct described above, Defendant has, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

73. Defendant, with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

74. By engaging in the conduct described above, Defendant, violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

# THIRD CLAIM FOR RELIEF

## Violation of Reg BI's General Obligation

## [Rule 15*l*-1(a)(1) of the Exchange Act, 17 CFR § 241.151-1(a)(1)]

75. The SEC realleges and incorporates by reference paragraphs 1 through

1 | 70 above.

2 |     76. By engaging in the conduct described above, when making recommendations of securities transaction to retail customers, Defendant failed to act in the best interest of the retail customers by failing to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.

    77. Also, by engaging in the conduct described above, Defendant made recommendations to retail customers without exercising reasonable diligence, care, and skill to have a reasonable basis to believe the recommendations were in the best interests of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.

    78. The failure of Defendant comply with Regulation Best Interest's Care Obligation, constitutes a violation of Regulation Best Interest's General Obligation.

    79. By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Rule 15l-1(a)(1) of the Exchange Act, 17 CFR § 240.15l-1(a)(1).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue a judgment, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15

U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rules 10b-5 and 15*l*-1(a)(1) thereunder.

### III.

Order Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### IV.

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.

### JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated: December 10, 2024

*/s/ Stephen Kam*
STEPHEN T. KAM
Attorney for Plaintiff
Securities and Exchange Commission